**DISTRICT COURT OF THE UNITED STATES**
**WESTERN DISTRICT OF NORTH CAROLINA**
**BRYSON CITY DIVISION**
**2:14-cv-38-FDW**

| | |
|---|---|
| **ROCKY JOHNSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **ORDER** |
| ) | |
| **EVA FIELDS, Nurse, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by

Defendants Captain Scott Allen, Lieutenant Anthony Gould, Lieutenant David Bishop, and

Captain William Salyers, (Doc. No. 67), and on a Motion for Summary Judgment by Diane Ray,

(Doc. No. 65).

## I.     BACKGROUND

### A.     Procedural Background

Pro se Plaintiff Rocky Johnson, an inmate in the custody of the United States Bureau of

Prisons, filed this action, under 42 U.S.C. § 1983, on August 25, 2014, bringing various claims

arising while he a pre-trial detainee at the Buncombe County Detention Center in Asheville,

North Carolina, between October 2012 and August 2013.  (Doc. No. 1; see also Doc. No. 68-1 at

8: Pl.'s Dep.).  Plaintiff purported to bring numerous claims against Defendants, including claims

for excessive force, deliberate indifference to serious medical needs, and unconstitutional

conditions of confinement, and claims under the First Amendment and the Religious Land Use

and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq.  Plaintiff originally

named as Defendants Eva Fields, Tabiatha Bruner, Ryan P. Zabloudil, FNU Cox, FNU Ray, FNU Watkins, Diane Ray, Scott Allen, Lieutenant Gould, Lieutenant David Bishop, and Captain Bill Salyers.

On November 14, 2014, this Court dismissed Plaintiff's Complaint without prejudice based on a failure to exhaust administrative remedies and for failure to state a claim against Defendant Diane Ray for deliberate indifference to serious medical needs. (Doc. No. 9). Plaintiff appealed, and on June 30, 2015, the Fourth Circuit Court of Appeals affirmed the dismissal of all of Plaintiff's claims except for the following claims: (1) a claim against Defendants Salyers and Ray for deliberate indifference to a serious medical need, in violation of his rights under the Eighth Amendment; (2) a claim against Defendants Allen and Bishop that he was prohibited from possessing his Bible for sixty days, in violation of RLUIPA and the First Amendment; (3) a claim against Defendants Allen and Bishop that he was deprived of his ability to write letters for the same period, in violation of his rights under the First Amendment; and (4) a claim against Defendants Gould, Allen, and Bishop, that he was denied a shower and a change of clothes for twelve days, in violation of his rights under the Eighth Amendment. (Id., Doc. No. 14).

Following remand, this Court entered a scheduling order, setting the deadline for dispositive motions as May 15, 2017. On May 15, 2017, Defendant Ray filed a summary judgment motion. (Doc. No. 65). Defendant Ray's summary judgment materials include all pleadings and attachments, Ray's own Affidavit, the Affidavit and curriculum vitae of Dr. James Parsons, and the medical records reviewed by Defendant Ray and Dr. Parsons. On the same date, the remaining Defendants filed their own summary judgment motion. (Doc. No. 67). The remaining Defendants' summary judgment materials include excerpts from Plaintiff's

deposition; affidavits of each of the moving Defendants; Plaintiff's relevant medical records; and the affidavit of non-party April Stroupe, the Clinical Site Coordinator for the Buncombe County Detention Center, attesting that Plaintiff's medical records are true and correct.

On July 6, 2017, this Court entered an order in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motions for summary judgment and of the manner in which evidence could be submitted to the Court. (Doc. No. 75). Plaintiff has responded to the summary judgment motions, and Defendants have filed Replies. <u>See</u> (Doc. Nos. 87, 88, 89). This matter is therefore ripe for disposition.

**B.      Factual Background**

**1.      The Parties' Evidence Regarding Plaintiff's Claim for Deliberate Indifference to Serious Medical Needs**

**a.      Plaintiff's Allegations**

Plaintiff alleges that, while a pre-trial detainee at the Buncombe County Detention Center, Defendants Ray and Salyers failed to provide "adequate medical care" and that Defendants have been "deliberately indifferent" to Plaintiff's serious medical needs. (Doc. No. 1-2 at p. 4, ¶ A). Plaintiff asserts that, while in isolated confinement, "correctional personnel without medical training" were allowed to decide if medical treatment should be awarded. (<u>Id.</u>). Plaintiff alleges that, while in confinement, he was having "electrifying back pain from being assaulted and laying on concrete." (<u>Id.</u> at p. 4, ¶ 1). Plaintiff asserts that "jail officials" should not be allowed to determine whether an inmate needs prompt treatment. (<u>Id.</u> at p. 4, ¶ A).

Plaintiff asserts that on February 15 he was eventually allowed to see the nurse, who noted that he was lying on the concrete without a mattress, holding his back. (<u>Id.</u> at p. 4, ¶ 2).

Plaintiff states that he was seen on February 21 in a sick call for back pain, and on March 7 he was given Neurontin for the back pain. (<u>Id.</u> at p. 4, ¶ 3). He states that from June 6 to July 6, "Transform Health" denied him medical treatment. (<u>Id.</u> at p. 4, ¶ 4). He states that on August 6, he "finally received gabapentin [sic] for nerve damage." (<u>Id.</u> at p. 4, ¶ 5). According to Plaintiff's own allegations, he was seen on at least four different occasions: February 15, February 21, March 7, and June 6 for treatment of his back pain. (<u>Id.</u>). Moreover, the medical records show he was seen on June 27 for follow-up on his back pain as a result of him submitting a sick call. (Doc. No. 6-1 at p. 9). Plaintiff's grievance dated June 26, 2013, asserts that Defendant Ray told him that the medical provider told her not to put him on the provider list. (Doc. No. 1-2 at p. 12). Plaintiff asserts the same allegation in his grievance report dated July 8, 2013. (<u>Id.</u> at p. 24).

### b. Defendants' Summary Judgment Evidence As to Plaintiff's Medical Treatment at the Detention Center

#### i. Plaintiff's Medical Treatment by the Provider Eva Fields and Others

The detention center engages TransformHealth to provide medical treatment to its inmates. (Doc. No. 68-4 at ¶ 7: Salyers Aff.). During Plaintiff's confinement, Eva Fields, a licensed Family Nurse Practitioner employed with TransformHealthRX at all relevant times, provided medical treatment to inmates and was colloquially referred to as the detention center's "Provider." (<u>Id.</u> at ¶ 11; Doc. No. 68-1 at 190:1-2: Pl. Dep.).

On March 7, 2013, Fields documented that Plaintiff had been in a car accident in 1998 and was told that he had damage to his lumbar spine at L4. (Doc. No. 1-2 at 21). In the past, he has been taking Neurontin (gabapentin) and ibuprofen for pain. (<u>Id.</u>). He also reported that, before being in the "tank," he had been getting ibuprofen from the commissary and taking that

twice a day, but he had not had any in the last three days and had been sleeping on the floor. Fields diagnosed him with chronic back pain and wrote medication orders for Plaintiff to receive 800 mg of ibuprofen and 300 mg of Neurontin, both twice a day.  (Id.; see also Doc. No. 68-1 at 199:18-200:6).  After the detention center discovered Plaintiff was hoarding his Neurontin, Fields discontinued his Neurontin on June 6, 2013.  (Doc. No. 68-4 at ¶¶ 14-16; Doc. No. 68-1 at 208:16-209:15).  On around June 19, 2013, Plaintiff filed an inmate grievance, complaining about his Neurontin being discontinued.  (Doc. No. 68-4 at ¶ 14).  Defendant Salyers provided Plaintiff with a response to the grievance, attaching a letter from Ms. Jami Reese, a registered nurse for TransformHealthRX, stating that the provider had discontinued Plaintiff's Neurontin. (Id. at ¶ 16).  Salyers also repeated Ms. Reese's instructions that, if Plaintiff had further complaints, he should submit a "Sick Call."  (Id.).

On June 27, 2013, Nurse Tirgoala documented seeing Plaintiff for a sick call to follow-up on back pain: "Inmate was informed that due to being caught multiple times hiding his meds (Neurontin) that there may not be anything else we can start him on at this time - will discuss with Bruce before placing him on Eva's list."  (Id. at p. 9).  Due to Plaintiff's complaints regarding his back pain, Fields again examined Plaintiff on July 11, 2013.  (Doc. No. 68-1 at 226:1-16, Ex. 22; Doc. No. 68-5: Stroupe Aff.).  Fields declined to resume Plaintiff's Neurontin after Plaintiff admitted to hiding the medication on two occasions, as Fields believed he "could not be trusted" due to his disciplinary history.  (Doc. No. 68-1, Ex. 22; Doc. No. 68-5, Ex. A). Fields elected to continue the treatment of Plaintiff's back pain with ibuprofen.  (Id.).  Fields again examined Plaintiff on August 6, 2013.  (Doc. No. 68-1 at 228:14-25, Ex. 24; Doc. No. 68-5, Ex. A).  Fields reiterated her concerns that Plaintiff posed a "safety risk," due to his hoarding of the Neurontin, but ultimately elected to resume the Neurontin due to Plaintiff's complaints of

back pain.  (Id.).

### ii.    Conduct and Participation by Defendants Ray and Salyers

The only remaining Defendants as to Plaintiff's deliberate indifference claim are Defendants Ray and Salyers.  At all relevant times, Defendant Ray was a private individual employed by TransformHealthRX to provide services via a contractual agreement with the Buncombe County Detention Facility.  (Doc. No. 66-2 at ¶ 3: Ray Aff.).  Defendant Ray has been a licensed practical nurse since 2004.  (Id. at ¶¶ 1, 14-15).  At all relevant times, she was a medication nurse, and it was her responsibility to provide prescribed pain medication as ordered to inmates and dispense over-the-counter medication as allowed.  Defendant Ray was not allowed to prescribe medications to inmates.  (Id. at ¶¶ 4, 8).  As the medication nurse, Defendant Ray did not have any responsibility for placing or prioritizing patients on the sick call list.  (Id. at ¶¶ 6-7).  Ray states that at no time did she ever tell Plaintiff he could not be seen by a medical provider.  (Id. at ¶ 6).

Plaintiff's medical records show that Defendant Ray had two documented encounters with Plaintiff.  The first encounter occurred on February 19, 2013, where Defendant Ray documented "sick call for back pain 'from lying on floor in booking'; inmate already on pain meds for this." (Doc. No. 6-1 at p. 10).  On July 4, 2013, Defendant Ray documented Plaintiff "has put in another sick call for back pain and to see the provider, has been caught hiding meds have put him on providers list." (Id. at p. 8).  There are no other documented encounters between Defendant Ray and Plaintiff.

Dr. Parsons is a licensed medical doctor, and he has submitted an affidavit in support of Defendants Ray's summary judgment motion.  Parsons reviewed Plaintiff's inmate medical and mental health records, including Ray's notes (Doc. No. 6-1), Plaintiff's Complaint with

attachments, (Doc. No. 1), other medical records filed by Plaintiff, (Doc. No. 6-1 & 11-1), and Ray's affidavit. (Doc. No. 66-4 at ¶ 4: Parsons Aff.). After Dr. Parsons' review, he concluded that Ray met the standard of care. (Id. at ¶¶ 5-10).

Defendant Salyers was at all relevant times employed as a Captain of the Buncombe County Sheriff's Department. He has no medical licensure and is not a medical doctor. (Doc. No. 68-4 at ¶ 8). Salyers thus does not decide whether an inmate is examined by the Provider (in this case, Fields) or the proper course of treatment; he, instead, relies on the medical expertise of the Provider and others employed by Transform Health. (Id. at ¶¶ 11, 12). Salyers was not involved in Fields' decision to discontinue the Neurontin. (Id. at ¶ 15).

**2.      The Parties' Evidence Related to Plaintiff's Remaining Claims (the Shower Claim, the Bible Claim, and the Correspondence Claim)**

**a.      Plaintiff's Disciplinary Problems While at the Detention Center**

During his confinement at the Detention Center, Plaintiff committed numerous disciplinary violations ranging from relatively minor offenses to significant offenses such as attempted escape. (Doc. No. 68-2 at ¶ 5: Bishop Aff.). As a result of these violations, Plaintiff received "a lot" of disciplinary sanctions during his confinement. (Doc. No. 68-1 at 96:21-97:2).

**i. Plaintiff's First Escape Attempt**

On February 9, 2013, just over three months into his stay, Plaintiff attempted to escape the detention center by cutting out the bar in his cell window. (Doc. No. 68-1 at 142:10-143:1). Plaintiff was fully aware that cutting the bar of his cell window was a detention center violation. (Id. at 144:21-25). The detention center charged Plaintiff with "Escape Attempt" and "Threat to Safety/Security of Facility." (Doc. No. 68-2 at ¶ 6; Doc. No. 68-1 at 143:15-18). After Plaintiff surrendered the tool used in his escape attempt, Lieutenant Gould reduced Plaintiff's violation to

property destruction of more than $100 (the "Property Destruction Violation"). (Doc. No. 68-2 at ¶ 7; Doc. No. 68-1 at 143:20-144:3).

Plaintiff pled guilty to the Property Destruction Violation at the Disciplinary Hearing on February 18, 2013. (Doc. No. 68-2 at ¶ 8; Doc. No. 68-1 at 145:1-3). Bishop consequently imposed multiple sanctions against Plaintiff, including: (i) permission to only keep personal hygiene items in his cell; (ii) permission to read incoming mail, but not to keep the mail in his cell; and (iii) prohibition against participating in free time, commissary, visitations, and telephone use (the "February 2013 Sanctions"). (Doc. No. 68-2 at ¶ 8; Doc. No. 68-1 at 146:1-148:2). The sanctions began on February 18, 2013, and continued for seven days, although Plaintiff received credit for the five days he previously spent in the detention center's Booking Unit. (Doc. No. 68-2 at ¶ 8; Doc. No. 68-1 at 145:6-25). During the February 2013 Sanctions, Plaintiff was not permitted to keep his Bible or his writing materials in his cell. (Doc. No. 68-1 at 147:4-18). Plaintiff did not appeal the February 2013 Sanctions. (Doc. No. 68-2 at ¶ 9; Doc. No. 68-1 at 148:3-5).

### ii. Plaintiff's Series of Detention Center Violations and Sanctions

Shortly after completing the February 2013 Sanctions, Plaintiff committed a series of "minor violations" of the detention center's policies. (Doc. No. 68-2 at ¶ 10). From March 25, 2013, until April 29, 2013, Plaintiff committed nine violations. (Id.). At his disciplinary hearing on May 4, 2013, Plaintiff pled guilty to the violation of "Repeated Minor Violations." (Doc. No. 68-2 at ¶ 11; Doc. No. 68-1 at 132:11-13). Consequently, Plaintiff received sanctions, including: (i) permission to only keep personal hygiene items and one book in his cell; (ii) permission to read incoming mail, but not to keep the mail in his cell; and (iii) prohibition against participating in free time, commissary, visitation, or telephone use (the "May 2013 Sanctions"). (Doc. No.

68-2 at ¶ 11; Doc. No. 68-1 at 132:14-135:8). Although Plaintiff was allowed to keep his Bible in his cell, he was not allowed to keep writing materials. (Doc. No. 68-1 at 134:19-23). The May 2013 Sanctions began on May 4, 2013, and continued for 25 days, concluding on May 29, 2013. (Doc. No. 68-2 at ¶ 11: Doc. No. 68-1 at 133:2-5). Plaintiff did not appeal the May 2013 Sanctions. (Doc. No. 68-2 at ¶ 12; Doc. No. 68-1 at 140:25-141:9).

### iii. Plaintiff's Hoarding of His Pain Medication

About one week after the conclusion of his May 2013 Sanctions, on June 5, 2013, detention center officials discovered Plaintiff hiding two yellow pills in a "makeshift envelope" hidden in his boxers. (Doc. No. 68-1 at 119:22-120:5; Doc. No. 68-2 at ¶ 15). Plaintiff also had been caught hoarding pills on two other occasions, although he does not remember the exact circumstances. (Doc. No. 68-1 at 123:18-25; Doc. No. 68-2 at ¶ 17). Although Plaintiff cannot recall exactly, he believes the pills were Neurontin (gabapentin). (Doc. No. 68-1 at 120:24-121:10). Plaintiff knew that hoarding medication constituted a violation of the detention center's policy. (Doc. No. 68-1 at 123:7-11).

Plaintiff pled guilty to the violation "Accumulation of Meds" on June 10, 2013. (Doc. No. 68-2 at ¶ 15; Doc. No. 68-1 at 123:12-14). Following his guilty plea, Plaintiff received multiple sanctions, including: (i) permission to keep only personal hygiene items and religious materials in his cell; and (ii) prohibition against participating in free time, commissary, visitation, or telephone use (the "June 2013 Sanctions"). (Doc. No. 68-2 at ¶ 16; Doc. No. 68-1 at 124:13-23). The June 2013 Sanctions began on June 10, 2013, and continued uninterrupted for thirty days, concluding on July 10, 2013. (Doc. No. 68-2 at ¶ 16; Doc. No. 68-1 at 124:24-125:3). Plaintiff received lengthier sanctions due to Plaintiff's repeated hoarding of his medications. (Doc. No. 68-2 at ¶ 17; Doc. No. 68-1 at 123:18-25). Plaintiff did not appeal the June 2013

Sanctions. (Doc. No. 68-2 at ¶ 18; Doc. No. 68-1 at 127:6-10).

### iv. Plaintiff's Second Escape Attempt

On around July 13, 2017, officers found contraband and damage to Plaintiff's cell, tending to show that he had made a second escape attempt. (Doc. No. 68-2 at 31). On July 17, 2013, one week after the conclusion of Plaintiff's June 2013 Sanctions, the detention center scheduled a disciplinary hearing to address Plaintiff's second attempted escape. (Doc. No. 68-2 at ¶ 19; Doc. No. 68-1 at 100:23-24). Plaintiff was charged with two violations: "Fac/Propr Destruct/More Than $100" and "Contraband/Escape Tool." (Doc. No. 68-2 at ¶ 19). Plaintiff pled "not guilty" to the violations, claiming that he did not attempt to cut the bar on his cell's window and that the sharpened metal tool found in his cell was "planted" by the Detention Center. (Doc. No. 68-2 at ¶ 20; Doc. No. 68-1 at 103:20-25). Ultimately, Lieutenant Bishop found Plaintiff guilty of the violations. (Doc. No. 68-2 at ¶ 21; Doc. No. 68-1, Ex. 3). Bishop's determination arose from the circumstances surrounding the incident, including Plaintiff's claim that detention center employees "planted" the sharpened metal tool lacked credibility; that an inspection of Plaintiff's cell about one week prior did not note any damage; and that Plaintiff had "no regards" for the detention center's rules, as he had received sanctions on three prior occasions and committed approximately 30 rule violations during his confinement. (Doc. No. 68-2 at ¶ 21). Plaintiff consequently received multiple sanctions, including: (i) being housed in a cell lacking an exterior wall and/or window; (ii) permission to maintain only personal hygiene items in his cell; (iii) permission to read incoming mail, but not to keep such mail in his cell; and (iv) prohibition against participating in free time, commissary, visitation, or telephone use (the "July 2013 Sanctions"). (Doc. No. 68-2 at ¶ 22; Doc. No. 68-3 at ¶ 6: Scott Allen Aff.; Doc. No. 68-1 at 110:15-111:18). The July 2013 Sanctions began on July 22, 2013, and were scheduled to

conclude on September 20, 2013.  (Doc. No. 68-2 at ¶ 22; Doc. No. 68-1 at 110:15-111:18).

Plaintiff appealed the July 2013 Sanctions due to his inability to correspond with his family and to keep his Bible in his cell.  (Doc. No. 68-1 at 116:21-117:8; Doc. No. 68-2 at ¶ 23).  On July 26, 2013, Captain Allen denied Plaintiff's appeal after the detention center's Appeal Board unanimously approved the sanctions as "fair and proportionate."  (Doc. No. 68-3 at ¶ 9, Ex. A; Doc. No. 68-1, Ex. 4).  In an effort to encourage better behavior from Plaintiff, Allen instructed Plaintiff that if no disciplinary issues occurred in the next 30 days, Plaintiff would be permitted "1 written letter to family and possession of a Bible."  (Doc. No. 68-3 at ¶ 10, Ex. A; Doc. No. 68-1 at 117:19-25, Ex. 4).  Plaintiff was transferred from the detention center on August 15, 2013, and thus served the July 2013 Sanctions for only 24 days.  (Doc. No. 68-2 at ¶ 24; Doc. No. 68-1 at 118:9-119:10).

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party.  The nonmoving

party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.    DISCUSSION

### A.  PLAINTIFF'S CLAIM OF DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

Plaintiff's deliberate indifference claim against Defendants Ray and Salyers arises from the alleged delayed medical treatment of his back pain for two months—from June 6, 2013 (when the Provider Shields discontinued the Neurontin) until August 6, 2013 (when the Provider Shields resumed the Neurontin).

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment.[1] Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim under the Eighth

_____

[1] Because Plaintiff was a pre-trial detainee at all relevant times, his deliberate indifference claim is properly brought under the Fourteenth Amendment, rather than the Eighth Amendment, but

Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). The constitutional right is to

---

the analysis is the same. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983); but see Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 2475 (2015) (holding that the test for excessive force claims brought by pretrial detainees under the Fourteenth Amendment differs from the test for excessive force claims brought by convicted prisoners under the Eighth Amendment). This Court observes that even if the Fourth Circuit were to apply to pre-trial detainees' deliberate indifference claims the Kingsley v. Hendrickson "objective unreasonableness" standard that currently applies to pre-trial detainees' excessive force claims and apply that standard to deliberate indifference claims, Plaintiff has still not presented sufficient evidence to withstand Defendant Ray's and Defendant Salyer's summary judgment motions as to this claim.

medical care.  No right exists to the type or scope of care desired by the individual prisoner.  Id. at 763.  Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

 First, to the extent that Plaintiff has sued Defendants in their official capacities, a local government may be held liable under 42 U.S.C. § 1983 only if the plaintiff proves a "policy or custom" of the entity was a moving force behind a violation of constitutional rights.  Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  Generally, the failure to allege a specific policy or custom is fatal to an official capacity claim against a government unit.  See Alvarez v. Corr. Med. Servs., Inc., Civ. No. WDQ-10-179, 2015 WL 7012654, at *5 (D. Md. Nov. 12, 2015).  Here, the Complaint does not allege that Plaintiff's constitutional rights were violated pursuant to an unlawful policy or custom of the detention center.  Thus, Plaintiff's claims against Defendants in their official capacities are dismissed.

Next, to the extent that Plaintiff has sued the moving Defendants in their individual capacities, he has not raised a genuine dispute of fact as to his deliberate indifference claim to overcome Defendants Ray's and Salyers' summary judgment motions.[2]  First, as to Defendant Ray, Plaintiff cannot rebut the showing that Defendant Ray was not deliberately indifferent to a

---

[2]  To the extent that Plaintiff seeks injunctive and declaratory relief against Defendants, his claims are moot because he has been transferred away from the Buncombe County Detention Center.

serious medical need.[3]  Specifically, Defendant Ray, aside from routine medication administration, only documented two patient encounters.  On the first encounter, Defendant Ray noted Plaintiff complained of pain due to him lying on the floor in booking.  (Doc. No. 6-1 at p. 10).  Defendant Ray confirmed he was already receiving pain medications for the exact problem for which he was complaining.  (Id.).  Moreover, she instructed him on the proper protocol for filling out a sick visit request.  (Doc. No. 66-2 at ¶ 12: Ray Aff.).  Additional records confirm that Plaintiff was receiving 300 mg of Neurontin and 800 mg of ibuprofen, both twice a day, for back pain as of March 7, 2013.  (Doc. No. 1-2 at p. 21).

Defendant Ray's next visit with Plaintiff occurred on July 4, 2013, where she noted he had been hiding his medications and confirmed he had been placed on the provider list.  (Doc. No. 66-2 at ¶ 13; Doc. No. 6-1 at 8).  The undisputed evidence on summary judgment shows that Defendant Ray made a reasonable attempt to address Plaintiff's complaints, including confirming that he was on and receiving pain medications, instructing him on the proper protocols for submitting a sick form request, and confirming that he was on the list to be seen. As stated in her Affidavit, Defendant Ray was not responsible for determining the priority of patients on the sick call list, nor could she address Plaintiff's complaints of pain with anything other than previously prescribed medications and over-the-counter pain medications which were ordered by the nurse practitioner.[4]  Dr. Parsons's affidavit further supports a finding that Ray

---

[3]  Defendant Ray contends alternatively that she was not a state actor within the meaning of Section 1983, as she was not an employee of the Department of Public Safety.  Rather, she was employed by TransformHealthRX, which had a contract with the detention center to provide healthcare services.  Thus, she contends that she was merely a private party actor subject to suit under Section 1983.  The Court assumes, for the purposes of the summary judgment motion, that Ray was a state actor but, as discussed, infra, the Court finds that Defendant Ray is entitled to summary judgment on the merits of Plaintiff's deliberate indifference claim against her.

[4]  Moreover, as Defendants note, Plaintiff claims that his pain was not being managed properly,

was not deliberately indifferent to Plaintiff's medical needs.  See (Doc. No. 66-3 at ¶¶ 9-10:

Parsons Aff.).  Indeed, nothing in the summary judgment evidence even supports a claim for

negligence against Defendant Ray, much less the heightened standard required to survive on a

claim for deliberate indifference to a serious medical need.  Indeed, Plaintiff's allegations merely

reflect a difference of opinion over the proper course of medical treatment, which fails to state a

claim under Section 1983.  Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975).

    In addition to failing to present evidence on summary judgment showing that Defendant

Ray acted with deliberate indifference, Plaintiff has also not presented evidence on summary

judgment to create a genuine factual dispute as to whether Plaintiff was suffering from a serious

medical need that was not already being treated on the dates when he was seen by Defendant

Ray.  "A serious medical need is one that has been diagnosed by a physician as mandating

treatment or one that is so obvious that even a lay person would easily recognize the necessity

for a doctor's attention."  Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).  As discussed above,

Plaintiff was already receiving pain medication and had been placed on the sick call list.  In

Ray's limited interactions with Plaintiff, nothing appeared to necessitate a doctor's attention or

rose to the level of a serious medical need.  Dr. Parsons' affidavit supports this, in which he

attests that nothing on either the February 19th or June 4th visit indicated that Plaintiff needed to

be seen urgently.  (Doc. No. 66-3 at ¶ 11).

    Finally, as shown by Plaintiff's own medical records, the evidence on summary judgment

shows that Defendant Ray did not cause Plaintiff's injury, and Plaintiff has failed to raise a

genuine issue of disputed fact as to causation.  Plaintiff has not presented any evidence that any

---

while at the same time documentation from multiple providers shows that he was in fact
hoarding the pain medications prescribed to him.

perceived action or inaction by Defendant Ray caused any injury or harm or that there was even a worsening or exacerbation of a pre-existing injury. The records show clearly that Plaintiff had a back injury before his incarceration. (Doc. No. 6-1 at p. 11). Moreover, Plaintiff was also documented to have been hiding the very pain medications prescribed to address his pain. (Id. at pp. 8-9). Additionally, as noted, Plaintiff was stable on both of Defendant Ray's documented encounters, nothing indicated that he be seen urgently or emergently on either of those visits, and his complaints of pain were being adequately addressed by the medications he was on. (Doc. No. 66-3 at ¶ 10). In sum, for these reasons, Defendant Ray is entitled to summary judgment as to Plaintiff's deliberate indifference claim against her.

Defendant Salyers is also entitled to summary judgment as to Plaintiff's deliberate indifference claim. That is, as with his claim against Defendant Ray, Plaintiff has not shown that he suffered from a serious medical need that was not met. Moreover, and more significantly, Plaintiff simply has not shown that Defendant Salyers was involved in or made any decisions about Plaintiff's medical care. Rather, as non-medical personnel, Salyers relied on the professional judgment of the medical provider TransformHealthRX and its employees. See Miltier v. Beorn, 896 F.2d 848, 854-55 (4th Cir. 1990) (affirming grant of summary judgment in favor of prison officials when "[n]o record evidence suggests why the wardens should not have been entitled to rely upon their health care providers' expertise"); Gilmore v. Corr. Med. Servs., No. 2:09cv1075, 2010 WL 3220383, at *16 (S.D. W. Va. July 15, 2010) ("Because Plaintiff has not sufficiently alleged deliberate indifference claims against the medical providers who treated him, he cannot sufficiently allege deliberate indifference claims against the DOC Defendants, who were entitled to rely upon the professional medical judgment of the health care providers when reviewing Plaintiff's grievances concerning Plaintiff's treatment."). At most, Captain

Salyers denied Plaintiff's medical grievance, but a mere denial of a grievance is not sufficient to establish liability. See id. (dismissing Plaintiff's claim when he "alleged nothing more than the fact that the DOC Defendants were made aware of his medical issues through the grievance process, and failed to take any action"); Rowe v. Norris, 198 Fed. Appx. 579, 580 (8th Cir. 2006) (upholding summary judgment in favor of officer whose involvement was limited to denying the inmate's grievances). In sum, for these reasons, Defendant Salyers is entitled to summary judgment as to Plaintiff's deliberate indifference claim against him.

Finally, Plaintiff's deliberate indifference claim fails, in any event, because he received adequate treatment from the medical provider Eva Shields. It undisputed that Shields, as the Provider, examined Plaintiff on July 11, 2013, and again on August 6, 2013. (Doc. No. 68-1 at 226:1-11, 228:9-25, Exs. 23-24; Doc. No. 68-5, Ex. A). Although delay in medical treatment may constitute an Eighth Amendment violation, Shields saw Plaintiff within 35 days of the discontinuance of the Neurotin, and then again 26 days later, and Plaintiff had access to ibuprofen in the interim. Such brief delays are insufficient to establish a constitutional violation. See Williams v. Bartee, No. CCB-10-935, 2011 WL 2842367, at *4 (D. Md. Jul. 14, 2011) (entering summary judgment against deliberate indifference claim involving a "two-and-a-half month delay in dental treatment without serious consequence to plaintiff's overall dental health" and noting delays are not unexpected when the inmate is in segregation due to an escape attempt), aff'd, 469 Fed. Appx. 270 (4th Cir. 2012); Webb v. Hamidullah, 281 Fed. Appx. 159, 166 (4th Cir. 2008) ("An Eighth Amendment violation only occurs . . . if the delay results in some substantial harm to the patient.").

Furthermore, Shields' decision to discontinue Plaintiff's Neurontin fails to establish a deliberate indifference claim. Significantly, Shields discontinued the Neurontin after Plaintiff

"hoarded" it in an envelope hidden in his boxers on multiple occasions.  See (Doc. No. 68-5 at p.

7: Doc. No. 68-5, Ex. A (June 6, 2013 medical record stating "neurontin has been [discontinued]

by provider inmate for the second time has been caught with neurontin hidden in underwear";

June 20, 2013 medical record stating "I will put him on list to see provider though it is our policy

not to give meds to inmates who hide them as this is a safety issue for them and other inmates");

Doc. No. 68-2 at ¶ 15).  At the disciplinary hearing conducted on June 10, 2013, Plaintiff pled

guilty to the charged violation.  (Doc. No. 68-2 at ¶ 15, Ex. F; Doc. No. 68-1 at 123:12-14, Ex.

5).

Numerous courts have held that the discontinuation of medication due to an inmate's

prohibited "hoarding" of the medication cannot sustain a deliberate indifference claim.  Macleod

v. Onuoha, No. 6:13cv188-DCR, 2015 WL 632184, at *11 (E.D. Ky. Feb. 13, 2015) (stating that

"[c]ourts have consistently determined that prison medical doctors have not been deliberately

indifferent to a prisoner's medical needs by terminating certain medications after discovering

that the prisoner has been 'cheeking,' stowing, or otherwise abusing their prescribed

medications" and collecting cases); Blouir v. Powers, No. 4:07cv3103, 2009 WL 426279, at *5

(D.S.C. Feb. 19, 2009) (finding no deliberate indifference regarding Plaintiff's medication when

it was discontinued after Plaintiff's non-compliance and noting that "hoarding prescription

medication is a serious offense at the [state prison] because of the potential that an inmate may

sell or distribute the medication to other inmates").  Further, Plaintiff's insistence that he receive

treatment other than ibuprofen constitutes nothing more than a disagreement with the medical

provider about his treatment, which is not a cognizable Eighth Amendment claim.  Singletary v.

Khune, No. 1:13cv290, 2014 WL 2208140, at *5 (W.D.N.C. May 28, 2014) ("[M]ere

disagreement with the course of medical treatment will not support an Eighth Amendment claim

for deliberate indifference to serious medical needs.").

In sum, Plaintiff received adequate treatment from June 6, 2013, until August 6, 2013, and his disagreement with the Provider's treatment decisions cannot save his deliberate indifference claim. Defendants Ray and Salyers are, therefore, entitled to summary judgment as to Plaintiff's deliberate indifference claim against them.

## B. PLAINTIFF'S SHOWER CLAIM

The Prison Litigation Reform Act mandates that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correction facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1977e(a). In Porter v. Nussle, 534 U.S. 516 (2002), the United States Supreme Court instructed, in no uncertain terms, that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citations omitted).

Defendants contend, and this Court agrees, that Plaintiff's shower claim is barred due to his failure to exhaust administrative remedies. On July 25, 2013, Plaintiff filed an Inmate Grievance claiming that, during the 11½ day period he had been housed in the Booking Unit following his first escape attempt, Plaintiff had not received a shower and a clean jumpsuit. (Doc. No. 68-1 at 60:1-12, Ex. 1; Doc. No. 68-6 at ¶ 4: Gould Aff.). Lieutenant Gould dismissed the grievance on July 26, 2013, noting that Plaintiff received a shower on July 25, 2013. (Doc. No. 68-1 at 72:21-73:1, Ex. 2; Doc. No. 68-6 at ¶ 5, Ex. B). Plaintiff did not appeal Gould's dismissal of the grievance; therefore, his shower claim was not exhausted through all steps of the detention center's grievance process.[5] (Doc. No. 68-1 at 75:22-2, 88:19-24; Doc. No. 68-6 at ¶

---

[5] Plaintiff was aware of the detention center's appeal procedure and his ability to appeal the Shower Grievance, as evidenced by his appeals of the denied June 19, 2013, Inmate Grievance

6).  Defendant Gould is therefore entitled to summary judgment as to Plaintiff's shower claim.

Further, even assuming that Plaintiff appropriately exhausted his administrative remedies as to his shower claim, Plaintiff's claim that he was denied a shower and clean clothes for twelve days is insufficient as a matter of law to maintain an Eighth Amendment claim.  Numerous courts have held that the denial of a shower and clean clothes for periods greater than that alleged by Plaintiff is not a constitutional violation.  See McCoy v. Goord, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (noting "a two-week suspension of shower privileges does not suffice as denial of basic hygienic needs" and dismissing the inmate's conditions of confinement claim); Grant v. Warden, No. 1:10cv1608, 2011 WL 4048524, at *3 (E.D. Cal. Sept. 9, 2011) (holding Plaintiff's bare allegations that he was deprived of a shower for two weeks insufficient to state an Eighth Amendment claim); Briggs v. Heidlebaugh, No. Civ. 96-3884, 1997 WL 318081, at *3 (E.D. Pa. May 20, 1997) ("Plaintiff's next claim that he was not allowed to take a shower for two weeks fails as well.  The Eighth Amendment does not require that inmates receive frequent showers."); Walker v. Dart, No. 09cv1752, 2010 WL 669448, at *4 (N.D. Ill. Feb. 19, 2010) (holding that "[b]eing denied clean clothes for two weeks, though unpleasant, is not a deprivation serious enough to support an Eighth Amendment claim" and collecting cases).

In sum, for the reasons stated herein, Defendants Gould, Allen, and Bishop are entitled to summary judgment as to Plaintiff's shower claim.

## C.  PLAINTIFF'S FIRST AMENDMENT AND RLUIPA BIBLE CLAIM

In his Complaint, Plaintiff alleges First Amendment and RLUIPA Claims against Bishop

---

regarding his medical care and the denied July 2013 Sanctions resulting from his second escape attempt.  (Doc. No. 68-1 at 116:21-117:8, 216:21-218:3, Ex. 19; Doc. No. 68-4 at ¶ 17, Ex. C; Doc. No. 68-1; Doc. No. 68-2 at ¶ 23).

and Allen based on the July 2013 Sanctions, imposed after his second escape attempt, in which he was prohibited from possessing his Bible and from corresponding with family members for sixty days. (Doc. No. 1-2 at p. 6). Defendants contend that they are entitled to summary judgment as to Plaintiff's First Amendment and RLUIPA claims.[6] For the following reasons, the Court agrees.

As noted, Plaintiff alleges claims pursuant to both the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq. ("RLUIPA") and the First Amendment. Beginning with plaintiff's RLUIPA claim, RLUIPA provides, in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their

---

[6] As Defendants note, 42 U.S.C. § 1997e(e) directs: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." (emphasis added). Plaintiff's Complaint is entirely devoid of any allegation of physical injury pertaining to his First Amendment Claims or his RLUIPA Claim. Additionally, Plaintiff explicitly stated that he suffered no physical injury from the denial of his Bible during the July 2013 Sanctions. Defendants contend, therefore, that Plaintiff's failure to allege, let alone provide a "showing of," physical injury, unequivocally bars his First Amendment and RLUIPA Claims, all of which are brought pursuant to 42 U.S.C. § 1983. This Court does not agree that the absence of physical injury bars a First Amendment or RLUIPA claim, as a claim of religious discrimination is an injury in and of itself, separate and apart from the "mental or emotional injury" referred to in Section 1997e. See Etterson v. Newcome, No. 3:14cv650, 2016 WL 3912034, at *5-6 (E.D. Va. July 19, 2016) (construing Plaintiff's claim as a First Amendment claim, denying Defendants' motion to dismiss, and collecting cases finding that Section 1997e(e) does not bar relief).

religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).  Under RLUIPA, the plaintiff bears

the initial burden of showing that the challenged policy substantially burdens his exercise of his

religion.  See 42 U.S.C. § 2000cc-2(b); Holt v. Hobbs, 135 S. Ct. 853, 862 (2015).  The statute

defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central

to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246,

251 (4th Cir. 2009).  A "'substantial burden' is one that puts substantial pressure on an adherent

to modify his behavior and to violate his beliefs, [] or one that forces a person to choose between

following the precepts of her religion and forfeiting governmental benefits, on the one hand, and

abandoning one of the precepts of her religion on the other hand."  Lovelace v. Lee, 472 F.3d

174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted).

Once the inmate makes a prima facie showing, the burden shifts to the government to

prove that "the burden in question is the least restrictive means of furthering a compelling

governmental interest."  Ozmint, 578 F.3d at 250.  "'RLUIPA adopts a . . . strict scrutiny'

standard."  Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (quoting and citing Lovelace, 472

F.3d at 198 n.8).  Under RLUIPA, the court must give "due deference to the experience and

expertise of prison and jail administrators in establishing necessary regulations and procedures to

maintain good order, security and discipline, consistent with consideration of costs and limited

resources."  Cutter, 544 U.S. at 723 (quotation omitted).  "However, 'a court should not rubber

stamp or mechanically accept the judgments of prison administrators.' . . .  Rather, due deference

will be afforded to those explanations that sufficiently 'take[] into account any institutional need

to maintain good order, security, and discipline.'"  Couch, 679 F.3d at 201 (quoting Lovelace,

472 F.3d at 190).

As for Plaintiff's First Amendment claim, the Free Exercise Clause of the First

Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court has applied the First Amendment to the states through the Fourteenth Amendment. See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v. Comm'r of Internal Revenue, 490 U.S. 680, 699 (1989).

Although Plaintiff enjoyed First Amendment rights while he was a pre-trial detainee at the detention center, Plaintiff retained only those First Amendment rights that are compatible with the detention center's need to maintain discipline and safety. Pell v. Procunier, 417 U.S. 817, 822 (1974). Thus, "[i]n deference to the expertise of prison officials in managing the difficult challenges of prison administration, even when a prison policy substantially burdens an inmate's ability to practice his religious beliefs, the policy withstands a First Amendment challenge so long as it is rationally related to furtherance of a legitimate governmental interest."[7] Holley v. Johnson, No. 7:08cv00629, 2010 WL 2640328, at *3 (W.D. Va. Jun. 30, 2010) (citing Turner v. Safley, 482 U.S. 78, 89-91 (1987)). In Turner v. Safley, the Supreme Court identified four factors relevant to determining the reasonableness of a challenged prison regulation: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right

---

[7] Claims brought under the First Amendment are subject to a less demanding standard of proof than claims brought under RLUIPA, with RLUIPA claims requiring "strict scrutiny instead of reasonableness." See Lovelace, 472 F.3d at 199 n.8.

would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest.  See Turner, 482 U.S. at 89-90.

As an initial matter, Plaintiff overstates the time during which he served the July 13 sanctions, and thus the time he was prohibited from keeping his Bible in his cell and from corresponding through mail.  Although Bishop imposed the July 2013 Sanctions for sixty days, beginning on July 22, 2013, it is undisputed that Plaintiff left the detention center on August 15, 2013.  (Doc. No. 68-2 at ¶ 24, Ex. A; Doc. No. 68-1 at 118:9-119:10).  Plaintiff, therefore, served the July 2013 Sanctions for only 24 days.  (Id.).  In any event, the July 2013 Sanctions held a valid, rational connection to the detention center's legitimate penological interest in preserving prison security and maintaining order and discipline.  While he was at the detention center, Plaintiff repeatedly flagrantly and repeatedly violated the detention center's rules, including two escape attempts, numerous incidents of possessing prohibited contraband, the illegal hoarding of medications, and varying levels of property destruction, many of which occurred within days of the conclusion of prior sanctions.

Additionally, as recited in the Disciplinary Hearing report dated July 22, 2013, Bishop specifically imposed the more restrictive July 2013 Sanctions due to Plaintiff's three prior sanctions, his estimated thirty rule violations, and his blatant disregard for the detention center's rules.  (Doc. No. 68-2 at ¶ 21, Ex. G).  The imposition of the July 2013 Sanctions, including the removal of Plaintiff's Bible, served the significant penological interest of maintaining discipline. See Daigre v. Maggio, 719 F.2d 1310, 1313 (5th Cir. 1984) ("To promote the important government interest in maintaining discipline, officials must have available sanctions that impose incremental disadvantages on those already imprisoned."); Curbelo v. Pendergraph, No.

3:04cv21-03, 2006 WL 2240450, at *3 (W.D.N.C. June 15, 2016) ("The Court notes that

Plaintiff did not claim that Defendants instituted a policy inhibiting his First Amendment rights,

but only that he was disciplined during his religious services, which implicates not his First

Amendment rights, but the efficient and orderly operation of the jail."); Johnson v. Smith, No.

2:11-cv-59, 2011 WL 1134315, at *6 (N.D. Ga. Mar. 25, 2011) ("Courts have recognized that

First Amendment rights can be curtailed to a greater degree for prisoners in disciplinary

isolation.").

Next, as for alternative means to practice his religion, although Plaintiff could not use his

Bible during the twenty-four day period, Plaintiff admitted that he was not prohibited from

practicing his religion through alternative means during the July 2013 Sanctions, including by

praying.  (Doc. No. 68-1 at 150:20-24).  Nor has Plaintiff presented any evidence that he was

required to violate any tenet of his religion.  See Hanson v. Richardson, No. 2:06cv178, 2008

WL 818893, at *3 (N.D. Tex. Mar. 27, 2008) (dismissing inmate's First Amendment claim as

frivolous where "Plaintiff was not prevented from praying or required to perform any act in

violation of his Christian faith").  Additionally, if the detention center could not issue sanctions

with increasing severity, including confiscating Plaintiff's Bible, as occurred throughout

Plaintiff's continuous disciplinary violations, the detention center would be hindered in its ability

to manage discipline and order.  See Ham v. Padula, No. 6:10cv3058, 2012 WL 602836, at *4

(D.S.C. Feb. 2, 2012) ("[T]he third factor is satisfied because correctional officials would

otherwise not have this method of rewarding good behavior and for punishing inappropriate

behavior.").  Because the removal of the July 2013 Sanctions would negatively impact the

detention center's day-to-day operations, this third factor weighs in favor of Bishop and Allen.

Finally, Plaintiff's extensive disciplinary history evidences that no lesser restrictive

sanctions were suitable. Specifically, previously imposed, lesser restrictive sanctions, including sanctions permitting Plaintiff to maintain his Bible, had wholly failed to curtail Plaintiff's repeated violations of the detention center's policies. This evidence indicates that there were no "lesser restrictive" alternatives available to achieve the detention center's legitimate penological interest of order and discipline. See Woodroffe v. Oregon Dep't of Corrs., No. 05-977-MO, 2008 WL 2234583, at *35 (D. Ore. May 27, 2008) ("Plaintiff identifies no alternative to the valid penological interest of prohibiting sexually explicit images in inmate mail. Because the lack of any identifiable alternatives to the prohibited mail-policy indicates that it is not an exaggerated response, the fourth Turner factor also favors Defendants.").

In sum, each of the four factors articulated in Turner favor Defendants Allen and Bishop. Recognizing the important governmental interest in maintaining the detention center's discipline and consistent with the wide-ranging deference afforded to Defendants Allen and Bishop, the July 2013 Sanctions did not impermissibly infringe on Plaintiff's First Amendment right, and thus these Defendants are entitled to summary judgment on Plaintiff's Bible claim.

Next, as for Plaintiff's RLUIPA claim, Plaintiff cannot establish that the July 2013 Sanctions "substantially burdened" his religious exercise. As stated previously, the July 2013 Sanctions did not prohibit alternative means of worship, such as prayer, and in no way forced Plaintiff to violate his religious principles. See Blake v. Rubenstein, No. 2:08-0906, 2016 WL 5660355, at *18 (S.D. W.Va. Apr. 5, 2016) (noting that "a substantial burden must be more than inconvenience or a less desirable situation" and that a "substantial burden requires substantial pressure on an adherent to modify his behavior and to violate his beliefs") (internal quotations omitted). Additionally, Plaintiff's Bible was removed for twenty-four days. Such temporary restriction, which derived solely from Plaintiff's self-created disciplinary problems, was not a

substantial burden his exercise of his religion.[8]  See Reed v. Bryant, No. Civ. 16-461-C, 2017

WL 1174023, at *11 (W.D. Okla. Feb. 6, 2017) ("The temporary suspension of Plaintiff's

participation in a religious diet for abusing the religious diet policy, in this case for an extended

two-month period as a second violation, did not substantially burden Plaintiff's sincere religious

beliefs.").  Further, as articulated above, the July 2013 Sanctions served the compelling

government interest of maintaining the detention center's order and discipline via the least

restrictive means.  Plaintiff's RLUIPA Claim, therefore, is insufficient as a matter of law.

### D.  PLAINTIFF'S FIRST AMENDMENT CORRESPONDENCE CLAIM

As noted, Plaintiff also brings a First Amendment claim alleging that he was deprived of

his ability to write letters during the period of the July 13 sanctions.  Similar to his Bible claim,

Plaintiff's First Amendment correspondence claim against Defendants Allen and Bishop fails as

a matter of law.  Because Plaintiff's correspondence claim pertains to outgoing mail,[9] the July

2013 Sanctions are examined under the standard set forth in Procunier v. Martinez, 416 U.S. 396

---

[8]   To this extent, the Court finds that the facts of this action are distinguishable from
Blankenship v. Setzer, 681 Fed. App'x 274 (4th Cir. 2017) (unpublished), where prison policies
prohibited inmates from carrying their Bibles during transport from a detention center to the
county jail.  The facts of this case are simply different.  Here, Plaintiff was allowed to keep his
Bible until he lost that privilege because of serious disciplinary violations at the detention center,
including two escape attempts, destruction of property, hoarding medications, and keeping
contraband in his cell.  When Plaintiff's Bible was taken away from him under the July 2013
sanctions, he had already been sanctioned three times (in February, May, and June of 2013), and
the prior sanctions and resulting punishments had done nothing to deter him from continuing to
violate the detention center's rules and regulations.  The prison had the right to escalate the
disciplinary actions against Plaintiff, including prohibiting him from keeping his Bible in his cell
for the 24-day period.
[9]  Plaintiff has not alleged any denial of the right to send legal mail or other court-related mail;
his claim is limited to correspondence with his family members.  (Doc. No. 68-1 at 116:23-
117:8).  Further, there is no allegation that Plaintiff was denied receipt of incoming mail.  (Doc.
No. 1-2 at p. 6 ("Buncombe County Jail refused to let me send any outgoing mail without
meeting the important and/or necessary test.")).

(1974), rather than <u>Turner</u>, but the analyses are similar.  Pursuant to <u>Martinez</u>, the July 2013

Sanctions are justified if they further an "important or substantial governmental interest," which

is "unrelated to the suppression of expression," and are not "unnecessarily broad."  <u>Martinez</u>,

416 U.S. at 413-14.  As stated previously, the July 2013 Sanctions—which were implemented

only after Plaintiff's frequent and unceasing disciplinary violations—served the "legitimate

penological interest in preserving prison security and maintaining order and discipline."  In light

of these significant penological interests, courts have, on multiple occasions, upheld content-

neutral, temporary restrictions on outgoing correspondence.  <u>See</u> <u>Daigre v. Maggio</u>, 719 F.2d at

1313 (finding no First Amendment violation when Plaintiff was prohibited from writing letters

during special confinement and noting that "a narrower restriction on first amendment interests

would likely prove ineffective in maintaining discipline"); <u>Little v. Norris</u>, 787 F.2d 1241, 1243-

44 (8th Cir. 1986) ("The purpose of withholding personal mail is to make punitive isolation

unpleasant, and thereby discourage improper behavior and promote security within the prison.

Because the disciplinary sanction serves a valid purpose, and because thirty days is not an

excessive length of time, we do not believe the sanction is unconstitutional.") (citation omitted);

<u>Barfell v. Weisse</u>, No. 13-cv-854, 2015 WL 14018656, at *7 (E.D. Wis. Mar. 26, 2015)

(collecting cases and holding that Plaintiff's "First Amendment rights were not violated by the

temporary disruption of his right to receive and send mail while he was in segregation").  As a

result, Defendants Bishop and Allen are entitled to summary judgment on Plaintiff's

correspondence claim.

## IV.    CONCLUSION

In sum, for the reasons stated herein, the Court grants the summary judgment motions by

Defendants.[10]

**IT IS, THEREFORE, ORDERED** that:

1.  Defendants' Motions for Summary Judgment, (Doc. Nos. 65, 67), are **GRANTED**,

    and this action is dismissed with prejudice.

2.  The Clerk is respectfully instructed to terminate this action.

Signed: November 16, 2017

Frank D. Whitney
Chief United States District Judge

---

[10] Defendants also raised qualified immunity as a defense to Plaintiff's claims. Because the Court has determined that there was no constitutional violation in the first instance, the Court does not need to determine whether Defendants are entitled to qualified immunity.